**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION**

| | | |
|---|---|---|
| **DAVID McSPADDEN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **CV 05-B-2625-W** |
| | ) | |
| **PATRIOT HOMES, INC.; PATRIOT MANUFACTURING, INC.,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

This case is presently pending before the court on plaintiff's Motion for Summary Judgment. (Doc. 21.)[1] Plaintiff David McSpadden has sued defendants, Patriot Homes, Inc., and Patriot Manufacturing, Inc., alleging that they violated the Worker Adjustment and Retraining Notification ["WARN"] Act because they failed to notify him of the plant closing or mass layoff on January 16, 2004, and the plant closing on April 1, 2004. Upon consideration of the record, the submissions of the parties, the arguments of counsel, and the relevant law, the court is of the opinion that plaintiff's Motion for Summary Judgment, (doc. 21), is due to be granted in part and denied in part.

## I. SUMMARY JUDGMENT STANDARD

Pursuant to Fed. R. Civ. P. 56(c), summary judgment is appropriate when the record shows "that there is no genuine issue as to any material fact and that the moving party is

---

[1]Reference to a document number, ["Doc. ___"], refers to the number assigned to each document as it is filed in the court's record.

entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  The moving party bears the

initial burden of showing no genuine issue of material fact and that he is entitled to judgment

as a matter of law.  *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see*

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  In this case, plaintiff, the moving

party, has the burden of proof at trial.  The Eleventh Circuit, sitting *en banc*, has held:

> When the ***moving*** party has the burden of proof at trial, that party must
> show ***affirmatively*** the absence of a genuine issue of material fact:  it must
> support its motion with credible evidence that would entitle it to a directed
> verdict if not controverted at trial.   In other words, the moving party must
> show that, on all the essential elements of its case on which it bears the burden
> of proof at trial, no reasonable jury could find for the nonmoving party.

*United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1438 (11th Cir.

1991)(emphasis in original).  Once the moving party has met his burden, Rule 56(e) requires

the non-moving party to go beyond the pleadings and show that there is a genuine issue for

trial.  Fed. R. Civ. P. 56(e); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986).   A

dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for

the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, the court's function is not to "weigh the

evidence and determine the truth of the matter but to determine whether there is a genuine

issue for trial."  *Id.* at 249.  Credibility determinations, the weighing of evidence, and the

drawing of inferences from the facts are left to the jury, and, therefore, evidence favoring the

non-moving party is to be believed and all justifiable inferences are to be drawn in its favor.

*See id.* at 255.  Nevertheless, the non-moving party need not be given the benefit of every

inference but only of every **reasonable** inference.  *See Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## II.  <u>STATEMENT OF FACTS</u>[2]

Defendant Patriot Manufacturing[3] employed plaintiff at its Sulligent, Alabama manufacturing facility [hereinafter "Sulligent Facility"].  (Doc. 23-3 ¶ 3; doc. 25 at 12.)  Joel Logan was the General Manager of the Sulligent Facility prior to January 16, 2004.  (Doc. 26 at 9.)  On January 8, 2004, Logan informed Dave Troyer, Vice-President of Patriot Manufacturing and Patriot Homes, that he was resigning to start a competing business.  (Doc. 26 at 9; doc. 27 at 3.)  Troyer had previously heard a rumor that Logan might be leaving defendants to start a competing business.  (Doc. 53, Att. 1 at 1.)  He had gone to Sulligent in December 2003 to ask Logan if the rumor was true,  (*Id.*)  At that time, Logan denied he had any plan to resign.   (*Id.*)

---

[2]The Statement of Facts is drawn from the evidence viewed in the light most favorable to plaintiff, the non-moving party, and all justifiable inferences have been drawn in her favor.

[3]In his brief in support of summary judgment, plaintiff states that defendant "Patriot Homes, Inc. is due to be dismissed without prejudice since [plaintiff] was an employee of Patriot Manufacturing, Inc. and not Patriot Homes, Inc."  (Doc. 22 at 15.)  Thus, defendants note contend that plaintiff has "concede[d] that Defendant **Patriot Homes, Inc.**, is not a proper defendant in this action, based on plaintiff's assertion that defendant **Patriot Manufacturing** was his employer."  (Doc. 52 at 3 [original emphasis deleted and emphasis added].)  Despite this concession, defendants have not moved to dismiss Patriot Homes.  Moreover, the court notes that the evidence shows that **Patriot Manufacturing** is a division of **Patriot Homes**, and the officers of both are the same.  In addition, the numerous documents offered by the parties were generated by **Patriot Homes** and/or are printed on **Patriot Homes** letterhead.  Specifically, the letter informing the employees of the shutdown of the Sulligent facility purportedly came from **Patriot Homes**.  Thus, it appears that **Patriot Homes**, and not **Patriot Manufacturing** may be the proper defendant.

On January 11, 2004, Troyer went to Sulligent.  (*Id*. at 2.)  He testified, "Before the day was over, I learned that all but one member of the . . . management team had . . . resigned to go to work with Mr. Logan."[4]  (*Id*.)  He further testified that he "believed [defendants] had no choice but to temporarily shut down the [Sulligent] Facility until [they] could recruit and put into place a new management team."  (*Id*.)

On or about January 12, 2004, Logan met with the employees and told them that defendants were going to close the Sulligent Facility.  (Doc. 27 at 23.)  Soon after, Troyer had a plant-wide meeting, during which he told the employees that defendants did not intend to close the Sulligent Facility permanently.  (Doc. 23, Att. 2 at 4.)

The Sulligent Facility was closed and all current employees resigned or were laid off effective January 16, 2004.  (Doc. 30 at 8.)  Defendants contend they had 128 employees at the Sulligent facility on that date.  (Doc. 27 at 6.)

From the parties submissions, the court has identified 134 named employees.  One employee, Charles Aycock, was employed at defendants' Hamilton Facility.  (Doc. 35 at 8; doc. 37 at 6; doc, 39 at 1.)  Another employee, Melissa Dawn Weeks, was discharged on January 7, 2004 – more than a week before the Sulligent Facility shut down.  (Doc. 37 at 3.)  Five employees – Melvin Alex Credille, William C. Goodwin, Chad E. Mitchell, Jimmy Royce Riddle, and James C. Shotts – apparently were terminated sometime prior to January

---

[4]The parties have not identified any of the members of the "management team" except Logan.

1, 2004, as the evidence shows that these employees had no earnings in 2004.  (Doc. 53 at 4.)  Therefore, the court finds that defendants had 127 employees on January 16, 2004.

Of these 127 employees, the record shows that five employees – Jerry Ray Cooper, Timothy W. Gann, Jimmy Hawkins, Joel Logan, and Randy Pennington – resigned or "quit for own business" effective January 16, 2004.  (Doc. 39 at 6, 9, 11; doc. 40 at 1, 7.)  Also, 29 employees had worked for defendants for less than six months as of January 16, 2004, and, therefore, are considered part-time employees for purposes of the WARN Act.[5]  Two employees – Benjamin Hightower[6] and Daniel Richardson – transferred to the Hamilton Facility effective January 21, 2004.  (Doc. 39 at 12; doc. 40 at 8.)

---

[5]The WARN Act defines part-time employees as "an employee who is employed for an average of fewer than 20 hours per week or who has been employed for fewer than 6 of the 12 months preceding the date on which notice is required."  29 U.S.C. § 2101(a)(8).  According to defendants, the part-time employees are Brian K. Cagle (hired July 30, 2003), Brian Bernard Childs (hired July 31, 2003), Daniel W. Haney (hired August 1, 2003), Thomas Edgar Arnold (hired August 5, 2003), David W. Hughes (hired August 11, 2003), Eric Lendley Hall (hired August 12, 2003), Russell Douglas King (hired August 12, 2003), Brandy Denise Chandler (hired August 13, 2003), Donald L. Felkins (hired August 13, 2003), Lawrence Bonman (hired August 16, 2003), Anthony Shane Taylor (hired August 25, 2003), Brooks T. Brasher (hired August 27, 2003), Tammy R. Bozeman (hired September 23, 2003), Matthew Dean Dodd (hired September 29, 2003), Todd E. Jackson (hired September 29, 2003), Jade E. Robinson (hired October 9, 2003), Shannon Jacoby (hired October 10, 2003), Belinda K. Stidham (hired October 10, 2003), Linda Gail Stuckey (hired October 13, 2003), Demicio Arellano (hired October 14, 2003), Rodney Metcalf (hired October 14, 2003), Jimmy Jacob Miles (hired October 14, 2003), James Thomas Ballard (hired October 20, 2003), Roger Dewayne Cantrell (hired October 20, 2003), Terry McKay (hired October 27, 2003), Jeremy Garret Foster (hired October 29, 2003), Joan F. Hawkins (hired November 3, 2003), Benjamin Hightower (hired November 10, 2002), Joseph D. Eads (hired November 19, 2003).  (Doc. 38 at 8; doc. 42 at 1-5.)

[6]Hightower had been with defendants less than six months at the time of his transfer. See, *supra*, note 4.

5

For purposes of the WARN Act, the court finds that 92 full-time employees were laid-off when defendants shut down the Sulligent Facility effective January 16, 2004.

On January 19, 2004, the following letter from Troyer was inserted in the Sulligent employees' paychecks:

> We at **Patriot Homes** realize the events that transpired the week of January 12 probably left you concerned, shocked, and confused with a lot of unanswered questions. I want to take this opportunity to answer some of the questions you have and explain Patriot's role in those events.
>
> . . .
>
> Before last week, our plans for [the Sulligent Facility] were all positive and growth oriented. We had and still have plans to renovate the facility to accommodate product improvements such as building a drywall station inside of the plant, and adding Modular homes to the [Sulligent Facility's] line-up of HUD homes. In a meeting held the morning of Tuesday, January 13, 2004, you were told that Patriot Homes had plans all along to close this division. I want to assure you that Patriot never had any intention of closing [the Sulligent Facility]. The renovations would, of course, have slowed down production temporarily, but our intention was to avoid lay offs and simply work around it.
>
> As you know, key members of the [Sulligent Facility's] management staff have opted to leave **Patriot Homes** and start another manufactured housing facility. As you were probably surprised by this information last week, we were equally surprised when they tendered their resignation to us on Thursday, January 8. We were informed that most of the office and plant supervisors intend to join the new company as well. We have no ill will towards anyone who wishes to spread their wings and pursue another opportunity. We wish them well in this new endeavor. The problem we were left with was, now what do we do?
>
> After a great deal of consideration, we came to the realization that we simply can't run a manufacturing plant without our management staff. We're going to take this opportunity to continue with our plans for renovation of the plant, begin the search process to replace our General Manager, Production Manager,

6

Service Manager, and other key positions, and *reopen a new, improved [Sulligent Facility] in the near future*. Unfortunately, this process will undoubtedly take some time – perhaps several months. *Your name will remain on a recall list for three months, and you'll be contacted directly should a recall position become available*. Employees may also apply for a transfer to our SouthRidge Homes division in Hamilton, AL, or to any of our other divisions in Texas, Missouri, and Indiana.

. . .

We sincerely hope to re-employ each of you when this process is complete, and hope that *even if you can't wait for us right now, you'll consider coming back later on*. You, the employees, are what make up [the Sulligent Facility], and we hope our paths will cross again in the near future.

(Doc. 53, Att. 1 at 4-5 [emphasis added]; *see also* doc. 27 at 5.)

The following day, Regional Sales Manager Mac Carr[7] sent a letter to defendants'

retailers that stated in part:

As you may have already heard, *Patriot Homes* experienced a major change relating to our [Sulligent Facility] during the week of January 12, 2004.

. . . .

On January 8, key members of the . . . management staff tendered their resignation, effective January 16. The General Manager, Service Manager, Production Manager, and several others opted to leave *Patriot Homes* and start another manufactured housing facility.

. . .

While this situation initially looked bleak for *Patriot Homes*, we are now realizing the unexpected benefits. The production of [the Sulligent Facility]

_____

[7]Defendants have described Carr as the Regional Sales Manager for *Patriot Manufacturing*. (S*ee* doc. 52 at 9.) His letter indicates that he represents *Patriot Homes*. (*See* doc. 53, Att. 1 at 6-7.)

has been moved to our Hamilton, AL facility with twice the production capacity and best suited for finished drywall.  All outstanding orders and service work will be transferred there as well.  ***We intend to re-open [the Sulligent Facility] in four to six months*** after completing some renovations on the facility and replacing our management staff.

(Doc. 53, Att. 1 at 6-7 [emphasis added].)

Troyer testified that he had met with the Mayor of Sulligent and that he had made public the fact that defendants were looking to hire new managers at the Sulligent Facility. (Doc. 53, Att. 1 at 2.)  However, according to Troyer, "By April 2004, it was clear that [defendants] were not going to be able to reopen the [Sulligent Facility] in the near future because we could not find experienced management and because so many of our experienced . . . workers had gone to work with Joel Logan . . . ."  (*Id.*)

Despite defendants' expressed intentions, the Sulligent Facility never reopened. Defendants decided to close the facility permanently on April 1, 2004.[8] (Doc. 23, Att. 2 at 5; doc. 53, Att. 1 at 3.)  In October 2005, Patriot Homes sold the Sulligent plant to Steve Logan, Joel Logan's father.  (Doc. 50; doc. 53, Att. 1 at 3.)  Defendants did not notify their employees, the City of Sulligent, or the State of Alabama before closing the Sulligent facility permanently.  (Doc. 23, Att. 2 at 5.)

---

[8]At oral argument, defendants' counsel stated that he could not ascertain the exact date that the decision to close the facility permanently was made; however, he stated that he had used April 1, 2004 in his calculations.  Therefore, the court assumes, for purposes of summary judgment that defendants closed the Sulligent Facility permanently on April 1, 2004.

According to Susan J. Richmond, Vice-President of Administration and Human Resources for defendants, (doc. 24 at 7; doc. 26 at 4-5), 40 of the laid-off, full-time employees went to work for Logan before March 31, 2004, and 16 of the laid-off, full-time employees, not including Hightower and Daniel, were transferred or "recalled" to defendants' Hamilton, Alabama facility on or before July 16, 2004. (*Id*. at 2-3.) The record does not show the exact date that these employees were transferred or recalled to the Hamilton facility or the date that they accepted positions with Logan's company. Plaintiff did not go to work at the Hamilton facility or for Logan.

## III. <u>DISCUSSION</u>

"The Worker Adjustment and Retraining Notification Act . . ., 29 U.S.C. § 2101 et seq., obliges covered employers to give employees . . . 60 days notice of a plant closing or mass layoff." *North Star Steel Co. v. Thomas*, 515 U.S. 29, 31 (1995).

> With some exceptions and conditions, WARN forbids an employer of 100 or more employees to "order a plant closing or mass layoff until the end of a 60-day period after the employer serves written notice of such an order." 29 U.S.C. § 2102(a). The employer is supposed to notify, among others, "each affected employee" or "each representative of the affected employees." 29 U.S.C. § 2102(a)(1). An employer who violates the notice provisions is liable for penalties by way of a civil action that may be brought "in any district court of the United States for any district in which the violation is alleged to have occurred, or in which the employer transacts business." § 2104(a)(5). The class of plaintiffs includes aggrieved employees (or their unions, as representatives), *ibid*., who may collect "back pay for each day of violation," § 2104(a)(1)(A), "up to a maximum of 60 days," § 2104(a)(1).

*Id*. at 31-32.[9]

Plaintiff contends that he was entitled to notice under the Act; defendants disagree. They contend that the layoff/shut-down on January 16, 2004, was neither a plant closing nor a mass layoff as defined by the WARN Act because, at the time, defendants intended to reopen the Sulligent Facility within six months.  Therefore, notice under the Act was not required.  Further they argue that, at the time they decided to close the plant permanently on April 1, 2004, an inadequate number of employees experienced an employment loss, and, therefore, the decision to close the Sulligent Facility did not qualify as a plant closing under the Act.

## A.  JANUARY LAYOFF AND SHUTDOWN

Defendants contend that the January shutdown of the Sulligent Facility was neither a "plant closing" nor a "mass layoff" as defined by the WARN Act.  They argue that they

---

[9]Although not before the court, local governments may also seek damages based on an employer's failure to give timely notice of a plant closing or mass layoff.  Section 2101(a)(2) requires the employer to serve notice of a plant closing or mass layoff "to the State or entity designated by the State to carry out rapid response activities . . . and the chief elected official of the unit of local government within which such closing or layoff is to occur."  29 U.S.C.A. § 2102(a)(2).  Section 2104(a)(3) provides:

> Any employer who violates the provisions of section 2102 of this title with respect to a unit of local government shall be subject to a civil penalty of not more than ***$500 for each day of such violation***, except that such penalty shall not apply if the employer pays to each aggrieved employee the amount for which the employer is liable to that employee within 3 weeks from the date the employer orders the shutdown or layoff.

29 U.S.C.A. § 2104(a)(3)(emphasis added).

intended that the shutdown would be temporary.  Therefore, they argue that notice to affected employees was not required before the January 16, 2004, shut down.

"Not every reduction in force or plant shutdown is a 'mass layoff' or 'plant closing.' Rather, only those reductions in force and plant shutdowns that result in an 'employment loss' are 'mass layoffs' and 'plant closings.'" *Graphic Communications Intern. Union, Local 31-N v. Quebecor Printing (USA) Corp.*, 252 F.3d 296, 300 (4th Cir. 2001)(citing 29 U.S.C. § 2101(a)(2)("defining 'plant closing' as a 'permanent or temporary shutdown . . . if the shutdown results in an employment loss'"); 29 U.S.C. § 2101(a)(3)("defining 'mass layoff' as 'a reduction in force' that is not the result of a plant closing and '(B) results in an employment loss'")).  An "employment loss" is one of three specific negative employment decisions:  (1) "**termination** other than a discharge for cause, voluntary departure, or retirement; (2) "**layoff** exceeding six months" and (3) "**reduction in hours of work** of more than 50 percent during each month of any six-month period."  29 U.S.C. § 2101(a)(6)(A)-(C)(emphasis added).

Viewing the evidence in the light most favorable to defendants, the non-moving parties, the court finds that defendants shut down the Sulligent Facility on January 16, 2004, because of the resignations of the plant manager and other management employees.  Also, at the time of the shutdown, defendants intended to reopen the plant within six months after hiring new managers and renovating the facility.  (Doc. 23, Att. 2 at 4; doc. 53, Att. 1 at 4-5, 6-7.)

11

Assuming for purposes of summary judgment that defendants intended the shutdown on January 16, 2004, to be temporary and to last less than six months,[10] the court finds none of the laid-off employees experienced an "employment loss" under the WARN Act at that time. *See* 29 U.S.C. § 2101(a)(6)(B). Also, because defendants decided to permanently close the Sulligent plant on April 1, 2004, the January layoff did not actually last more than six months. The court finds, for purposes of summary judgment, that there are disputed issues of fact as to whether the shutdown of the Sulligent Facility on January 16, 2004, resulted in an employment loss.

Therefore, plaintiff is not entitled to judgment as a matter of law as to its claim that defendants were required to send prior notice of the January shutdown; thus, plaintiff's Motion for Summary Judgment is due to be denied on this ground.

## B.  APRIL DECISION TO CLOSE THE SULLIGENT FACILITY

Defendants contend that they were not required to send notice of their decision to close the Sulligent Facility permanently because, on April 1, 2004, they did not have the required number of "affected employees." They argue:

> In this case, at the time [defendants] made the decision to close the [Sulligent] Facility, [it] no longer had 50 employees (who could suffer an employment loss) to trigger the definition of "plant closing" found in Section

---

[10]Plaintiff disputes the fact that defendants intended to reopen the Sulligent plant at the time of the January shutdown.  (*See* doc. 54 at 1-3.)  For purposes of deciding plaintiff's Motion for Summary Judgment, the court must resolve all disputed issues in favor of defendants, the non-moving parties.

[2101](a)(2).[11] ***Most of the [Sulligent Facility] employees had already gone to work for Deer Valley***, the start-up manufactured housing company started by [Logan].  By April 2004, [the Sulligent Facility] no longer had the number of employees necessary to trigger the WARN Act's notice requirements.

(Doc. 52 at 17-18 [footnote added; emphasis added].)

Contrary to defendants' argument, the date for counting affected employees is not April 1, 2004; it is the date notice should have been sent, which is 60 days before the event causing the employment loss.  *See* 20 C.F.R. § 639.5(a)(2)("The point in time at which the number of employees is to be measured for the purpose of determining coverage is the date the first notice is required to be given.").  For purposes of summary judgment, that date is January 31, 2004.  The court finds, for the reasons set forth below, that defendants' decision to close the Sulligent Facility on April 1, 2004,  affected 92 full-time employees, which is a sufficient number of employees to constitute a plant closing under the WARN Act.  *See* 29 U.S.C. 2101(a)(2).

The Act defines "affected employees" as "employees who may reasonably be expected to experience an ***employment loss*** as a consequence of a proposed plant closing or mass layoff by their employer." 29 U.S.C. § 2101(a)(5)(emphasis added). As set forth above, an "employment loss" is "(A) an employment termination, other than a discharge for cause, voluntary departure, or retirement, (B) a layoff exceeding 6 months, or (C) a reduction in

---

[11]Section 2101(a)(2) defines a "plant closing" as "the permanent or temporary shutdown of a single site of employment . . . if the shutdown results in an employment loss at the single site of employment during any 30-day period for 50 or more employees excluding any part-time employees."  29 U.S.C. § 2101(a)(2).

hours of work of more than 50 percent during each month of any 6-month period." *Id*. (a)(6). Under the WARN Act, an employer is required to provide prior notice of a plant closing that affects 50 or more full-time employees. *Id*. (a)(2).

Employees that are laid off with the expectation of recall suffer an employment loss if the plant closes while they are on layoff status.   20 C.F.R. § 639.3(a)(1); *Kildea v. Electro-Wire Products, Inc.*, 144 F.3d 400, 405 (6th Cir. 1998)("[T]emporarily laid[-]off employees with a reasonable expectation of recall are considered employees under the WARN Act.  It makes sense, then, that such employees, who have a reasonable expectation of recall, would experience a job loss when a plant is shutdown and thus would be considered affected employees under the WARN Act.")(internal citations and quotations omitted); *Martin v. AMR Services Corp.*, 877 F. Supp. 108, 114 (E.D.N.Y. 1995)("Workers on temporary layoff or on leave who have a reasonable expectation of recall are counted as employees. . . . The provision appears designed to prevent employers from circumventing WARN requirements in bad faith by "laying off" employees before "terminating" them.")(internal citations omitted).

Therefore, defendants' employees on temporary layoff with the reasonable expectation of recall are considered affected employees, unless they voluntarily resigned or were discharged for cause before January 31, 2004.

14

### 1.  Employees Terminated or Laid Off Prior to January 16, 2004

Defendants contend that 21 employees were discharged or resigned before January 16, 2004.  (Doc. 53, Att. 2 ¶ 5 and ex. A.)  Therefore, these employees are not considered to have suffered an employment loss pursuant to 29 U.S.C. § 2101(a)(6)(A) when the Sulligent Facility closed on April 1, 2004.  However, the record shows that only one employee was discharged before January 16, 2004.[12]  Of the remaining 20 employees, the record indicates that 5 resigned voluntarily on January 16, 2004.[13]  The record contains no evidence of the reason for termination of five employees on defendants' list; however, for purposes of summary judgment only, the court presumes that these five employees were discharged before January 16, 2004, because these employees had no earnings in 2004.[14]  The court finds that these employees were not affected by defendants' decision to close the Sulligent Facility on April 1, 2004.  However, defendants' records show that the remaining ten employees on

---

[12]Melissa Weeks was discharged or terminated on January 7, 2004.  (Doc. 42 at 6.)

[13]The record shows that the following employees "quit for own business" effective January 16, 2004 – Jerry Ray Cooper, Timothy Gann, Jimmy Hawkins, Joel Logan, and Randy Pennington.  (Doc 35 at 8; doc. 39 at 6, 9, 11; doc. 40 at 1, 7.)

[14]The record shows the following employees had no earnings for 2004 – Melvin Credille, William Goodwin, Chad Mitchell, Jimmy Royce Riddle, and James Shotts  (Doc. 53 at 4.)

defendants' list were laid off for "lack of work" effective January 16, 2004.[15]  The court finds these ten employees are affected employees.

## 2.  Employees Hired By Logan Before March 31, 2004

Defendants contend that 40 employees, who "went to work for Deer Valley in the first calendar quarter of the year 2004," should not be included in the total number of affected employees.[16]  (*See* Doc. 52 at 17-18; doc. 53, Att. 2 ¶ 7.)  Nothing in the statute or the regulations specifically addresses the issue of whether acceptance of other employment during a temporary layoff, but after the notice date, constitutes a voluntarily resignation and, thus, changes the status of an affected employee, should the temporary layoff exceed six months or the plant subsequently close.  The definition of an employment loss excludes voluntary termination or discharge for cause, as well as layoffs lasting less than six months.  Moreover, the case law suggests that other employment after a temporary layoff, but before an employment loss, does not reduce an employer's liability for failure to notify its

---

[15]These employees are Perry Broyles, Jeffery Carr, Edward Carter, Scott Frye, Johnny Grant, Coy McKay, James Miles, Daniel Wade Ross, Richard Stewart and Christopher Weeks.  (Doc. 35 at 10; doc. 39 at 4-5, 9-10; doc. 40 at 2, 4, 8-10.)

[16]These employees are: John Wesley Allen, Joy Dell Berry, Michael L. Brasher, David Brown, Garland G. Clark, Scott E. Clark, Jennifer Mitchell Cribbs, Vince Martin Emerson, James Bryan Evans, Roy R. Franks, Robert Kenneth Gann, Robert C. Gillion, Steven Andrew Hicks, Rick Lockhart, Shelby A. Lockhart, Nathan Mann, Jason Markham, Barbara Ann McKay, James Troy McKay, Sam Daniel McKay, Gregory Allen Merchant, Anthony Miles, Frank Nizamis, Jeff W. O'Mary, Marion R. O'Mary, Robbie Ogden, Terrell J. Parker, Betty Sue Pearce, Tim Pearce, Jeannie Peoples, Shannon W. Posey, John F. Sanderson, Gregory Scott Seals, Tim Shirley, Lomax Swanigan, Jr., Maurice D. Truelove, James Brandon Ticker, James A. Walker, Phillip Walker, and Thomas Jeffrey Webb.

employees of the impending employment loss. *See Saxion v. Titan-C Manufacturing*, 86 F.2d 553, 560 (6th Cir. 1996)(noting that the WARN Act contains no provision to "allow an employer to reduce its statutory liability by the amount of its employees' outside earnings" after a layoff, indicating "the desire to avoid placing a burden on a terminated employee to mitigate damages . . . or the desire for simplicity in the statutory scheme")(quotations and citations omitted); *see also Staudt v. Glastron*, 92 F.3d 312, 314 (5th Cir. 1996)(citing *Carpenters Dist. Council v. Dillard Dept. Stores*, 15 F.3d 1275, 1285 n.14 (5th Cir. 1994), *cert. denied*, 513 U.S. 1126 (1995))

During oral argument, defendants cited the court to the *Employer's Guide to Advance Notice of Closing and Layoffs*, published by the Employment and Training Administration of the United States Department of Labor. (*See* doc. 56 and Att. 1 at 1.) The section entitled Frequently Asked Questions About WARN contains the following:

> What if I pay my workers for 60 days in lieu of notice and then an employee gets another job within what would have been the notice period, am I required to continue making payments to the employee through the notice period?
>
> No. If an employee gets another job within the 60-day period, this is viewed as a voluntary termination that makes the employee ineligible to collect damages.

(Doc. 56, Att. 3 at 8.)

This hypothetical situation is distinguishable from the circumstances of this case. In this case, defendants laid-off all their employees and closed the Sulligent Facility. The employees were given neither 60-days notice of the impending closing nor payment after the

closing in lieu of notice.  The facility was never reopened and, slightly more than 60 days thereafter, defendants closed the facility permanently.  The record contains no evidence that Logan hired any of the 40 employees before January 31, 2004, the notice date.  Also, the record contains no evidence that any of these employees voluntarily terminated their employment or were discharged for cause while on layoff status but before the notice date.  Indeed, nothing in the record indicates that the laid-off employees that subsequently went to work for Logan ever informed defendants that they would not return if recalled or otherwise altered their layoff status with defendants.  Defendants' letter to their laid-off employees indicates that defendants intended these employees to return to the Sulligent Facility when it reopened, even if the employees had found other work in the interim.  (*See* doc. 53, Att. 1 at 3-4.)  The court finds that the employees laid off on January 16, 2004, with the expectation of recall that subsequently went to work for Logan sometime before March 31, 2004, experienced an employment loss when defendants permanently closed the Sulligent facility.

### 3.  Employees Transferred or Recalled to Hamilton

Defendants also contend that 17 employees that were "recalled or transferred" to the Hamilton Facility should not be included in the number of employees that suffered an employment loss because of the plant closing.

Two employees – part-time employee Benjamin Hightower[17] and full-time employee Daniel Richardson – transferred to defendants' Hamilton Facility effective January 21, 2004, just days after the lay off and more than 60 days before defendants decided to close the Sulligent Facility permanently.  The court finds that these two employees are not employees affected by the closing of the Sulligent Facility.  The record is silent as to the date the remaining 16 employees transferred or were "recalled" to the Hamilton Facility, except to state that they were employed at the Hamilton Facility within six months of the closing of the Sulligent Facility.[18]

The Act states that employees to whom "the employer offers to transfer . . . to a different site of employment . . . with no more than a 6-month break in employment" are not considered to have experienced an employment loss.  29 U.S.C. § 2101(b)(2)(A).  However, this section applies only "if the closing or layoff is the *result* of the relocation or consolidation of part or all of the employer's business."  29 U.S.C. § 2101(b)(2)(emphasis added).

The evidence shows that defendants laid off their employees and subsequently closed the Sulligent Facility permanently because of the resignation of the managers at the Sulligent

---

[17]Hightower is not included on defendants' list of transferred/recalled employees because he was a part-time employee.

[18]These employees are Jerry Joseph Abbott, David Baker, William Chad Baker, Patrick J. Beckmann, Linda M. Dodd, Carl E. Downey, Martin James Emerson, Nathan Jamie Hawkins, Randal P. Lindsey, Jonathan Kent Peoples, Richard Ray, James Lee Ross, Phillip Randy Silas, Anthony D. Thompson, Marcus Brandon Weeks, and Flynn T. White. (Doc. 53 at 7.)

Facility and defendants' inability to replace them.  Defendants have presented no evidence to rebut this evidence or to show otherwise that they closed the Sulligent Facility because of the relocation or consolidation of their business.  Indeed, the court finds that the undisputed evidence shows that relocation of a portion of defendants' business to the Hamilton Facility was not the reason defendants closed the Sulligent Facility; rather, it was a consequence of the closing.  Therefore, the court finds that defendants have not presented evidence that would allow a reasonable jury to find that the closing of the Sulligent Facility was the ***result*** of defendants' moving of their business to Hamilton; rather, the undisputed evidence shows that defendants moved their business to Hamilton as a ***result*** of the closing of the Sulligent Facility.

Therefore, the court finds that the 16 employees that transferred or otherwise were hired at the Hamilton Facility within 6 months of their layoff from the Sulligent Facility are employees that suffered an employment loss when defendants closed the Sulligent Facility.

The court finds that the 66 employees that defendants contend were not affected employees under the WARN Act because they went to work at the Hamilton Facility or for Logan were employees actually affected by the closing of the Sulligent Facility under the terms of the WARN Act.  Defendants do not contest the fact that an additional 26 employees, including plaintiff, suffered an employment loss at the time the Sulligent Facility was

20

permanently closed.[19]  Therefore, the court finds that 92 employees suffered an employment loss on April 1, 2004 when the Sulligent Facility was closed.

Based on the foregoing, the court finds that, on January 31, 2004, defendants had more than fifty employees, who had been laid off on January 16, 2004, with the expectation of being recalled, that suffered an employment loss when the Sulligent Facility was permanently closed on April 1, 2004.  Therefore, defendants' decision to close the Sulligent facility plant on April 1, 2004, was a plant closing, as defined by the WARN Act, and defendants were required by law to notify these employees, including plaintiff, on or before January 31, 2004, 60 days before they closed the plant on April 2004.[20]  Defendants did not notify these employees on or before January 31, 2004.  Therefore, the court finds that plaintiff has established that defendants violated the WARN Act with regard to the April 1, 2004, plant closing.

---

[19]These 26 employees include plaintiff and the following:  Frances Bonman, Gary D. Cribbs, Phyllis Yvonne Downey, Marlene Fleming, Bonnie Lou Flynn, Willie Gardner, Jr., Johnny P. Gillespie, Brenda Hughes, Shane Inmon, Robert James Massey, Jerry Herald McDonald, Leila McMichael, George William McNeal, Amy Leigh Merchant, Danny Andrew Moon, Jacqueline Moon, Jewel L. Nelson, Edward Glen Newell, Jr., Kristi L. Nix, Kim Pennington, Carol G. Prothro, James B. Sanderson, Phillip Randy Silas, Rachel Ann Smith, Judy Weeks, and Roger Dewayne Weeks.

[20]The court notes that an employer is required to give notice to part-time employees, including those on the job less than 6 months.  *See* 20 C.F.R. § 639.6(b)("While part-time employees are not counted in determining whether plant closing or mass layoff thresholds are reached, such workers are due notice.").  Therefore, the 29 part-time employees were entitled to notice.

Plaintiff's Motion for Summary Judgment will be granted as to his claim that defendants' violated the WARN Act by failing to give him prior notice of the plant closing on April 1, 2004.[21]

## **CONCLUSION**

For the foregoing reasons, the court is of the opinion that there are no material facts in dispute and plaintiff is entitled to judgment as a matter of law as to his claim that defendants failed to give him notice, as required by the WARN Act, of the April plant closing.  However, the court finds issues of material fact exist as to whether plaintiff was entitled to notice prior to the layoff on January 16, 2004.  An Order granting plaintiff's Motion for Summary Judgment as to his claim based on the April plant closing and denying the Motion as to his claim based on the January layoff will be entered contemporaneously with this Memorandum Opinion.

---

[21]The court notes that defendants cite 20 C.F.R. § 639.4(b), which mentions unforeseeable business circumstances as a reason for an employer to delay giving WARN notices to its employees, with regard to whether the January shut down caused an employment loss.  (*See* doc. 52 at 14-15.)  They do not argue that the April 1, 2004, plant closing was caused by an unforeseeable business circumstance.  (*See id*. at  16-19.) Therefore, this court has not considered whether the plant closing in April was caused by unforeseeable business circumstances. *See Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995)("There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment. Rather, the onus is upon the parties to formulate arguments; grounds . . . not relied upon in summary judgment are deemed abandoned.")(citations omitted).

**DONE**, this the 31st day of March, 2008.

_Sharon Lovelace Blackburn_

SHARON  LOVELACE  BLACKBURN
CHIEF UNITED STATES DISTRICT JUDGE